No. 15-02021

In the United States Court of Appeals
for the First Circuit

Leon H. Rideout, Andrew Langlois, and Brandon D. Ross,
*Plaintiffs-Appellees,*
v.
William M. Gardner, Secretary of State of the State of New Hampshire, In His Official Capacity,
*Defendant-Appellant.*

On Appeal from the District Court for the District of New Hampshire

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AS *AMICUS CURIAE* IN SUPPORT OF APPELLEES**

Eugene Volokh
Scott & Cyan Banister
  First Amendment Clinic
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu[*]

---

[*] Counsel would like to thank Ryan Azad, Boris Mindzak, and Jacob Waschak, UCLA School of Law students who worked on this brief.

# RULE 26.1 DISCLOSURE STATEMENT

*Amicus Curiae* Reporters Committee for Freedom of the Press, a nonprofit corporation, hereby states that it has no parent companies, subsidiaries, or affiliates and that it does not issue shares to the public.

All parties have consented to the filing of this *amicus* brief.

# TABLE OF CONTENTS

                                                                             **Page**

Rule 26.1 Disclosure Statement ............................................................................. i

Table of Contents ................................................................................................. ii

Table of Authorities ............................................................................................ iii

Interest of *Amicus Curiae* ..................................................................................... 1

Summary of Argument .......................................................................................... 1

Argument ............................................................................................................... 2

    I.   Displaying How One Voted Is a Powerful and Constitutionally Protected Form of Political Speech ................... 2

    II.  The Prophylactic Ban on Displaying Ballot Photos Is Unconstitutionally Overinclusive ................................................. 5

Conclusion ............................................................................................................. 9

Certificate of Compliance ................................................................................... 10

Certificate of Service ........................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................... 3

*Butler v. Michigan*, 352 U.S. 380 (1957) ................................................... 2

*Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ............... 3

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ................................. 7, 8

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) .................. 5, 6

*Meyer v. Grant*, 486 U.S. 414 (1988) ......................................................... 4

*NAACP v. Button*, 371 U.S. 415 (1963) ..................................................... 5

*Riley v. Nat'l Fed'n for the Blind*, 487 U.S. 781 (1988) ........................ 6, 7

*Schneider v. State*, 308 U.S. 147 (1939) .................................................... 7

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980) .................................................................................................. 6

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ............ 4

**Other Authorities**

Jack Morse, *That 'Ballot Selfie' You Just Posted? Yeah, That's Illegal*, SFist, Nov. 3, 2015 ............................................................... 3

Zach Pluhacek, *No 'Ballot Selfies' in Nebraska, Secretary of State Says*, Lincoln J. Star, Sept. 4, 2015 .................................................... 3

## INTEREST OF *AMICUS CURIAE*

The Reporters Committee for Freedom of the Press is a voluntary association of reporters and editors that works to defend First Amendment rights and freedom of information interests. The Reporters Committee has provided representation, guidance, and research in First Amendment litigation since 1970. The Reporters Committee believes that sharing photographs of marked ballots is an important means for voters to express themselves, and for the media to report on how voters are expressing themselves.[1]

## SUMMARY OF ARGUMENT

Since the New Hampshire ballot photography ban was enacted, there have been no documented prosecutions for vote buying or voter coercion supposedly facilitated by ballot photography. Instead, the state has used this law to prosecute (1) a person who voted for his dead dog to

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person has contributed money that was intended to fund preparing or submitting the brief, except that UCLA School of Law paid the expenses involved in filing this brief. All parties have consented to the filing of this brief.

protest all candidates in an election, (2) a politician who encouraged others to vote, and (3) another politician who voiced his discontent with this law by sharing a photo of his ballot on social media. All of these are forms of fully constitutionally protected political expression.

As with other speech restrictions struck down by the Supreme Court, banning the sharing of ballot photographs in an attempt to prevent vote buying is like "burn[ing down] the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). In trying to punish criminal use of speech, the New Hampshire statute restricts too much innocent, valuable speech. Such overinclusive laws are forbidden by the First Amendment.

## ARGUMENT

### I. Displaying How One Voted Is a Powerful and Constitutionally Protected Form of Political Speech

A picture of a marked ballot captioned "get out the vote," "these candidates suck," or "vote for change" is a powerful form of political speech. It vividly and credibly shows the speaker's judgment about which (if any) candidates deserve support. Some such photographs could be "a

positive sign of civic engagement,"[2] posted by voters "because they're excited about voting and participating in the process."[3] Others, as this case illustrates, instead convey discontent.

All these examples involve valuable speech. Just as restrictions on the "quantity of campaign speech . . . while neutral as to the ideas expressed, limit political expression 'at the core of our electoral process and of the First Amendment freedoms,'" *Buckley v. Valeo*, 424 U.S. 1, 39 (1976) (citation omitted), restrictions on the use of ballot photographs as personal endorsements, while neutral as to viewpoint, also limit political expression at the core of our electoral process. And just as party endorsements of candidates are "'at the core of our electoral process and of the First Amendment freedoms,'" *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 222-23 (1989) (citation omitted), so too are individuals' endorsements.

---

[2] Jack Morse, *That 'Ballot Selfie' You Just Posted? Yeah, That's Illegal*, SFist, Nov. 3, 2015.

[3] Zach Pluhacek, *No 'Ballot Selfies' in Nebraska, Secretary of State Says*, Lincoln J. Star, Sept. 4, 2015 (quoting state Sen. Adam Morfeld).

3

Such ballot photographs are especially valuable precisely because they are visual: as pictures, they better grab readers' attention and convey more than mere words would. Even for commercial speech, the Supreme Court has recognized—in striking down a restriction on lawyers' use of illustrations in advertisements—that "[t]he use of illustrations or pictures . . . serves important communicative functions: it attracts the attention of the audience to the [speaker's] message, and it may also serve to impart information directly." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 647 (1985).

That must be at least as true for the political speech involved in this case. "The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988). And here there is very good reason to think that the choice to use ballot photographs, rather than just words describing one's vote, is indeed especially effective.

Voters' photographs of their ballots can also be used by the media. Such photographs can illustrate stories about voter attitudes towards the election process. And they can illustrate stories about possibly confusing

4

or manipulative ballot designs (such as the infamous "butterfly ballot" used in Florida in 2000). Photographs that voters display to their friends can turn into opportunities to inform and educate the public more broadly.

## II. The Prophylactic Ban on Displaying Ballot Photos Is Unconstitutionally Overinclusive

The government argues that all ballot photographs can be forbidden because some of them may be used criminally (to support criminal vote-buying or voter intimidation). But "[b]road prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone [in First Amendment jurisprudence]." *NAACP v. Button*, 371 U.S. 415, 438 (1963) (citations omitted). And indeed, the Supreme Court has repeatedly rejected laws containing broad content-based restrictions on speech when such laws restrict too much innocent, fully protected speech alongside fraudulent or otherwise unprotected speech.

For example, in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 340, 357 (1995), the Court struck down the state's ban on anonymous speech about ballot measures. The Court held that the government's legitimate interest in reducing fraud could not justify this "extremely broad prohibition" on anonymous leafleting, because the ban would affect too

5

many honest speakers. *Id.* at 351. New Hampshire's interest in preventing vote-buying likewise cannot justify the broad ban on all ballot photographs, because the ban also affects too many honest voters.

Likewise, in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 622 (1980), the Supreme Court struck down a ban on door-to-door solicitation by organizations that used more than 25% of their receipts for noncharitable purposes. The government argued that this restriction was a permissible means to prevent fraudulent fundraising, but the Court ruled that the restriction was unconstitutionally overbroad: the village's interest in preventing fraud would have to be served by punishing fraudulent misrepresentations directly or by encouraging financial disclosure—"measures less intrusive than a direct prohibition on solicitation." *Id.* at 637. And in a similar case, *Riley v. National Federation for the Blind*, 487 U.S. 781 (1988), the Supreme Court likewise insisted that the government's concern about fraud could not justify a broad restriction on protected speech:

> North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it. . . . If this is not the most efficient means of preventing fraud, we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency.

*Id.* at 795. The same can be said here: presumably, New Hampshire officials are ready and able to enforce bans on vote buying and on intimidation, and even if those are "not the most efficient means' of preventing [such crimes]," "the First Amendment does not permit the State to sacrifice speech for efficiency." *Id.*

Similarly, in *Schneider v. State*, 308 U.S. 147, 157-58, 165 (1939), the Supreme Court struck down an ordinance requiring a permit for distributing printed material house-to-house. Though the city argued that this was needed to prevent fraud, the Court responded that the government had to punish the fraudulent speech, rather than restricting all speech. *Id.* at 164.

> If it is said that these means [(punishment of fraud)] are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.

*Id.*

And four years later, the Supreme Court's decision in *Martin v. City of Struthers*, 319 U.S. 141 (1943), applied this principle even to a content-neutral ordinance justified by a concern about serious crime (residential

burglary). The ordinance banned all door-to-door canvassing, partly because of a concern that "burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later." *Id.* at 144. And the Court acknowledged that "door to door distributers of literature may be . . . a blind for criminal activities," *id.* at 145; *see also id.* at 144 n.5 (citing studies and court cases that acknowledged this concern).

But the Court concluded that the city instead had to control the danger of crime through "traditional legal methods" rather than by restricting speech. *Id.* at 147. New Hampshire can likewise control vote buying and voter coercion through traditional legal methods, such as by enacting a statute that punishes those criminal acts directly.

New Hampshire's categorical prohibition on sharing photographs of one's marked ballot is thus unconstitutionally overinclusive. It forbids a great deal of protected political speech that is completely unrelated to the government's interest in preventing vote buying. It equally punishes the college student proudly showing how he voted in his first election and the corrupt voter who participates in a vote-buying scheme. As the Supreme

Court has repeatedly demonstrated though its rulings on similarly well-meaning but overinclusive laws, this restriction violates the First Amendment.

## CONCLUSION

New Hampshire has ample means for enforcing its laws banning voter buying and intimidation. But an overinclusive ban on speech that vividly and effectively conveys the speaker's views about the electoral process is not constitutional.

    Respectfully Submitted,

    s/ Eugene Volokh

    Attorney for *Amicus Curiae*
    Reporters Committee for
    Freedom of the Press

9

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 1,629 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2010 in 14-point Century Schoolbook.

<pre>
                                   s/ Eugene Volokh

                                   Attorney for *Amicus Curiae*
                                   Reporters Committee for
                                   Freedom of the Press
</pre>

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief *Amicus Curiae* with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on April 21, 2016.

All participants in the case are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated: April 21, 2016

s/ Eugene Volokh
Attorney for *Amicus Curiae*
Reporters Committee for
Freedom of the Press
